JOURNAL ENTRY AND OPINION
{¶ 1} Appellant Jamill Shabazz Abdul[1] appeals his conviction and assigns the following errors for our review:
 "I. Appellant was not afforded effective assistance of counsel when defense counsel failed to inquire concerning prospective jurors bias toward members of the Muslim faith."
 "II. The trial court erred in denying appellant's motion for acquittal where evidence is not sufficient to support conviction." *Page 3 
 {¶ 2} Having reviewed the record and pertinent law, we affirm Shabazz Abdul's conviction. The apposite facts follow.
 {¶ 3} On April 26, 2007, a Cuyahoga County Grand Jury indicted Shabazz Abdul on one count of aggravated murder. The indictment included a three-year firearm specification, notice of prior conviction, and repeat violent offender specification.
 {¶ 4} On November 13, 2007, Shabazz Abdul executed a jury waiver as to the notice of prior conviction and repeat violent offender specification. On that same date, a jury trial commenced on the remaining charge of aggravated murder with a three-year firearm specification attached.
 Jury Trial {¶ 5} At trial, the evidence established that Shabazz Abdul is a member of a social organization or fraternity known as the "Mad Dogs," which originated on the campus of Central State University in Wilberforce, Ohio. The members joined the organization while attending Central State University.
 {¶ 6} Each year, on Good Friday, the members host a party called the Mad Dog Ball. The ball is held in a different Ohio city each year. In 2007, the Mad Dog Ball was held in Cleveland, Ohio at the Mirage Night Club; those in attendance included Shabazz Abdul, Gregory Rodgers, William Green, Theodore Carter, Charles Gatson, Dwayne Saunders and Dale Becket. *Page 4 
 {¶ 7} At trial, the State presented the testimony of 13 witnesses including William Green, who testified that after leaving the 2007 Mad Dog Ball, he proceeded to an after-hour party at the home of fellow Mad Dog member, Theodore Carter. Green testified that fellow members Dwayne Saunders and the victim, Gregory Rodgers, traveled with him to Carter's home.
 {¶ 8} Green testified that he observed Carter and Rodgers talking. Rodgers whispered something to Carter, who then stated "well, you got to get out of my house." Rodgers agreed to leave, began using profanity, and proceeded downstairs towards the living room.
 {¶ 9} Because Rodgers had traveled with Green to Carter's home, he also decided to leave. As Green walked downstairs towards the living room, other guests indicated that Shabazz Abdul pushed Rodgers down the steps. Green observed Shabazz Abdul exit the home through the back door and re-enter the home a few moments later.
 {¶ 10} When Shabazz Abdul re-entered the home, he had a small chrome-plated semi-automatic pistol in his hand. Shabazz Abdul cocked the gun, rushed up, placed the gun to Rodgers' head and pulled the trigger and then he calmly walked back up the stairs. *Page 5 
 {¶ 11} As Shabazz Abdul walked up the stairs, he turned around with the gun pointed at Green. As Shabazz Abdul continued to walk up the stairs, he stated: "I just killed Gromo. I'm killer Casy. Anybody else want some?"[2]
 {¶ 12} Green testified about the aftermath of the shooting as follows:
 "Q. Did you hear from the Defendant after that?
 A. Yes.
 Q. And how did you hear from him?
 A. He called me.
 Q. And what if anything did he say at that time?
 A. He seemed to be very, he seemed to be very remorseful and panic stricken himself, at this point, at which he said he didn't know if he should go kill himself. He said, what should I do, he said, just go kill myself? I told him, no, don't do that. He should turn himself in.
 Q. Did he say anything else to you?
 A. And he tried to say that it was an accident. I tried to tell him, no, it wasn't no accident. He just kind of got a temper back, said, what, you snitching, you snitching? I said, no, because I was scared, myself, at that point, scared for myself and scared for my little six year old child. I don't know if he's going to double back to Cleveland, come try to kill me.
 Q. Did the Defendant ever call you after that?
 A. Yes.
 Q. What, if anything, did he tell you at that time? *Page 6 
 A. He said he was going to get a lawyer and turn himself in, to get everything straightened out.
 Q. What did you say to him?
 A. I told him that was the best thing he could do. He promised me he would turn himself in."[3]
 {¶ 13} Theodore Carter testified that there were approximately 30 to 40 people present at his home for the after-hour party. The guests were socializing and having a good time.
 {¶ 14} During the course of the party, Rodgers called Carter a "bitch" and he asked Rodgers to leave. Rodgers agreed to leave, proceeded down the steps, but turned around, came back upstair and stated: "You all are bitches."[4] Rodgers proceeded downstairs with Shabazz Abdul following behind him.
 {¶ 15} A few moments later Carter heard a gun shot, went downstairs, and saw Rodgers slumped on the steps. Shabazz Abdul came up the stairs and stated that Rodgers was playing, because they were only blank shots.
 {¶ 16} Dwayne Saunders testified that he also attended the after-hour party at Carter's home. Saunders observed Shabazz Abdul kiss Rodgers, told him he loved him, and Rodgers responded that he loved Shabazz Abdul, but could not respect him for what he had done to him upstairs. Shabazz Abdul reminded Rodgers that he "messed" with guns, then Shabazz Abdul went out to his car. *Page 7 
 {¶ 17} Saunders testified as follows about the ensuing events:
 "Q. Then what did you see happen?
 A. When he came back in, me and Gro [Rodgers] were standing there and Gro said, you didn't have to go get a gun for me did you? I don't know if he said, did you have to go get a gun or did you have to go get that for me? And, from that point, he came in.
 Q. Who came in?
 A. Brandon. And, that's when he shot him.
 Q. Can you describe how he shot him?
 A. Yeah. We were standing on the landing when Brandon came in, basically just walked like this, three steps. And, we was on the first level. And, I think Brandon might have walked up one, maybe two steps and in between the wall and Gro and pulled the trigger."[5]
 {¶ 18} Shabazz Abdul shot Rodgers point blank on the left side of his head. A few days after the shooting, Shabazz Abdul contacted Saunders by phone. During their conversation, Shabazz Abdul claimed that the shooting was an accident and that he used blanks.
 {¶ 19} Dr. Erica Armstrong, a forensic pathologist with the Cuyahoga County Coroner's Office, testified that she performed the autopsy on Rodgers. Dr. Armstrong said the bullet entered Rodgers from the left side of his head and that the bullet had been fired from a distance of 12 inches or less. *Page 8 
 {¶ 20} Dale Beckett, who testified for the defense, said that he was not a member of the Mad Dog organization, but he was invited to the ball by Shabazz Abdul, whom he has known for approximately 30 years.
 {¶ 21} While at the after-hour party, Beckett heard Carter tell Rodgers to leave his home, because Rodgers was being obnoxious. Beckett observed Shabazz Abdul and Rodgers standing on the stairway with their arms around each other. Beckett said that it appeared to him that as Rodgers was in the process of putting on his jacket, a gun fell to the ground.
 {¶ 22} Beckett testified about the shooting, as follows:
 "A. It appeared to me like it came from that jacket. But, Shabazz, he seen the pistol and he said, man, what the hell is this? You don't need no gun for me. That's what it sounded like he said. I can't be exact, but it sounded like.
 Q. This is Shabazz saying that to the victim?
 A. To the victim. And as he went to put his jacket on, he put his hand through the arm and that's when I heard the gun go off. And, when the gun went off, he grabbed the side of his face and sat down on the step and he was rocking.
 Q. Where was the gun when it went off; you see that?
 A. The gun was in Shabazz's hands.
 Q. How did he get shot then?
 A. That, I don't know. It seemed to me when he put his jacket on, it hit his hand.
 Q. Hit whose hands? *Page 9 
 A. Actually, Shabazz's hand. He hit Shabazz's hand. That's what caused — — from my vantage point, that's what it looked like to me.* * *"[6]
 {¶ 23} On November 16, 2007, Shabazz Abdul requested a jury instruction on the lesser-included offenses of reckless homicide, negligent homicide, and involuntary manslaughter. The State requested a jury instruction on the lesser-included offense of murder. The trial court instructed the jury on aggravated murder, murder, reckless homicide, and negligent homicide.
 {¶ 24} On November 19, 2007, the jury found Shabazz Abdul guilty of murder with the three-year firearm specification attached. On November 28, 2007, the trial court found Shabazz Abdul guilty of the notice of prior conviction and repeat violent offender specifications. The trial court sentenced Shabazz Abdul to a prison term of 15 years to life for the murder charge and three years for the firearm specification. The trial court ordered consecutive sentences.
 Motion for Acquittal {¶ 25} For ease of discussion, we will begin with the second assigned error. In the second assigned error, Shabazz Abdul argues the trial court erred in denying his motion for acquittal because the evidence was insufficient to support his conviction. We disagree.
 {¶ 26} The sufficiency of the evidence standard of review is set forth in State v. Bridgeman:[7] *Page 10 
 "Pursuant to Criminal Rule 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt."[8]
 {¶ 27} Bridgeman must be interpreted in light of the sufficiency test outlined in State v. Jenks, [9] in which the Ohio Supreme Court held:
 "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence submitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. (Jackson v. Virginia [1979], 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, followed.)"
 {¶ 28} After reviewing the evidence in a light most favorable to the State, we find that the evidence, if believed, could convince a rational trier of fact that the State *Page 11 
had proven beyond a reasonable doubt each element of the charge of murder, namely that Shabazz Abdul, as a principle, purposely caused the death of Rodgers.
 {¶ 29} Two eye-witnesses, both members of the Mad Dog social organization, testified that they saw Shabazz Abdul exit the residence, re-enter after a few moments with a gun, and immediately shoot Rodgers in the head. Both Green and Saunders testified that Shabazz Abdul shot Rodgers at close range. In addition, Dr. Armstrong, a forensic pathologist, confirmed that Rodgers was shot in the head from a distance of less than 12 inches.
 {¶ 30} Consequently, viewing the evidence in the light most favorable to the State, we conclude that any rational trier of fact could have found that the State proved all of the essential elements of murder beyond a reasonable doubt. Thus, the trial court properly denied Shabazz Abdul's motion for acquittal. Accordingly, we overrule the second assigned error.
 Ineffective Assistance of Counsel {¶ 31} In the first assigned error, Shabazz Abdul argues that his defense counsel was ineffective for failing to voir dire prospective jurors about possible bias towards people of the Muslim faith. We disagree.
 {¶ 32} We review a claim of ineffective assistance of counsel under the two-part test set forth in Strickland v. Washington.[10] UnderStrickland, a *Page 12 
reviewing court will not deem counsel's performance ineffective unless a defendant can show his lawyer's performance fell below an objective standard of reasonable representation and that prejudice arose from the lawyer's deficient performance.[11] To show prejudice, a defendant must prove that, but for his lawyer's errors, a reasonable probability exists that the result of the proceedings would have been different.[12] Judicial scrutiny of a lawyer's performance must be highly deferential.[13]
 {¶ 33} In the instant case, Shabazz Abdul cites State v.Atalla, [14] in support of his claim that defense counsel was ineffective for failing to voir dire prospective jurors about possible bias towards members of the Muslim faith. However, we findAtalla distinguishable from the instant case and Shabazz Abdul's reliance on it misplaced.
 {¶ 34} Contrary to Shabazz Abdul's representation, Atalla does not stand for the broad proposition that the failure to inquire about prospective jurors' religious biases renders trial counsel's assistance ineffective. Rather, the court addressed the specific issue of whetherAtalla's defense counsel was ineffective *Page 13 
for failing to object to the prosecutor's questions concerning his religion and ethnicity when it was done in such a way as to create bias among the entire jury pool. The court further found that defense counsel added to the error in continuing the same line of questioning in a manner which created bias and prejudice in the minds of the potential jurors.
 {¶ 35} Unlike the facts of Atalla, we find that defense counsel's decision not to draw attention to Shabazz Abdul's religion was a matter of trial strategy. Voir dire is largely a matter of strategy and tactics.[15] Actions of defense counsel which might be considered sound trial strategy are to be presumed effective.[16] As such, we conclude that trial counsel was not ineffective in choosing not to inquire about the prospective jurors' feelings about members of the Muslim faith. Accordingly, we overrule the second assigned error.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
It is ordered that a special mandate be sent to said court to carry this judgment into execution. The defendant's conviction having been affirmed, any *Page 14 
bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
CHRISTINE T. MCMONAGLE, P.J., and MELODY J. STEWART, J., CONCUR
[1] Although the lower court's record indicates the spelling of appellant's first name as "Jamill," in appellant's pro se brief to this court, he spells his first name as "Jamil," which brief was sua sponte stricken from the record and is not a part of this opinion. Jamill Shabazz Abdul is also referred to in this opinion as Brandon.
[2] Tr. 318.
[3] Tr. 320-321.
[4] Tr. 380.
[5] Tr. 497.
[6] Tr. 587-588.
[7] (1978), 55 Ohio St.2d 261, syllabus.
[8] See, also, State v. Apanovitch (1987), 33 Ohio St.3d 19, 23;State v. Davis (1988), 49 Ohio App.3d 109, 113.
[9] (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
[10] (1984), 466 U.S. 668, 80 L.Ed.2d 674, 104 S.Ct. 2052.
[11] State v. Bradley (1989), 42 Ohio St.3d 136, paragraph one of syllabus.
[12] Id. at paragraph two of syllabus.
[13] State v. Sallie (1998), 81 Ohio St.3d 673, 674.
[14] 157 Ohio App.3d 698, 2004-Ohio-3414.
[15] State v. Keith (1997), 79 Ohio St.3d 514, 521.
[16] State v. Rodgers, 6th Dist. No. L-02-1089,2004-Ohio-3795, citing Strickland, supra, at 687. *Page 1